UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UP – Fieldgate US Investments –Fashion Square, LLC,

    Plaintiff,

vs.

The Bancorp Bank, Betsy Z. Cohen, Daniel Cohen

    Defendants.

_____/

## **COMPLAINT**

The Plaintiff, UP – Fieldgate US Investments –Fashion Square, LLC, ("Fashion Square" or "Debtor"), pursuant to 11 U.S.C. §§ 105, 502, and 510, Rule 7001(2) of the Federal Rules of Bankruptcy Procedure, and in support thereof, states as follows:

## **JURISDICTION, VENUE AND PARTIES**

1.    Venue is proper in this district under 28 U.S.C. § 1409.

2.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (B)(E) and (H).

3.    This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. §§1334 and 157, and the General Order Of Reference entered by the District Court for the Middle District of Florida, referring all Bankruptcy cases to this Court.

4.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (B) and (0).

5.      On January 5, 2017 ("Petition Date"), Fashion Square, filed its voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code.

6.      This is an Adversary Proceeding within the meaning of Rule 7001 of the Federal Rules of Bankruptcy Procedure

## Parties

7.      Fashion Square is a Florida limited liability company with its principal place of business in Orlando, Florida.

8.      Defendant The Bancorp ("Bancorp" or "Bank") is an FDIC-insured commercial bank that is incorporated in the state of Delaware. Its principal executive offices are located at 409 Silverside Road, Wilmington, DE 19809 and at 1818 Market Street, Philadelphia, PA 19103. Bancorp's common stock trades on the NASDAQ under the ticker symbol "TBBK."

9.      Defendant, Betsy Z. Cohen ("Betsy Cohen") founded Bancorp in 2000 and served as Bancorp's CEO from that time until December 31, 2014.

10.     Defendant, Daniel G. Cohen ("Daniel Cohen"), has been the Chairman of The Bancorp, Inc. and Chairman of its Executive Committee of the Board of Directors and its U.S. subsidiary since 1999.   Daniel Cohen was named Chairman of the Board of Directors of The Bancorp Bank effective January 1, 2015. Additionally, Daniel Cohen is an Executive Vice President at The Bancorp, and oversees the commercial mortgage-backed securities origination and sales division of the The Bancorp.

## GENERAL HISTORY

11.     The Debtor recently uncovered that, for over one year prior to when the Debtor entered into a relationship with Bancorp, Bancorp had been under significant pressure from bank

regulators to improve its balance sheet as the financial crisis had resulted in significant devaluation of the collateral supporting Bancorp's loan portfolio.

12.     One of Bancorp's principal lines of business was making commercial loans including mortgage loans, lines of credit, construction loans, and commercial acquisition and development loans.

13.     The Bank's approximate $1.34 billion portfolio of commercial loans was the largest asset on its balance sheet, and often exceeded 35% of all Bancorp's reported assets from 2010 through 2013.

14.     Between 2010 and 2013, Bancorp repeatedly reported substantial and growing profits, and stated that its commercial loan portfolio was a key driver of this profit.

15.     According to a recent lawsuit filed in the United States District Court for the District of Delaware, CIV-0952, against Bancorp by its investors, at the time the Debtor and Mr. Fish were introduced to Bancorp, Bancorp's commercial loan portfolio was rife with toxic credit and massive undisclosed losses.

16.      Desperate to cover up its bad commercial loans, Bancorp concocted a scheme. Bancorp would falsely give the appearance that its loans were supported by adequate financial security by refinancing the loans, amending loan terms and obtaining guaranties without proper due diligence.

17.     The Bank developed a regular practice of altering terms for non-performing delinquent loans or extending new credit to delinquent borrowers to disguise toxic credit.  This practice would make the soured loans appear current.

18.     Numerous former senior Bank employees with responsibility for overseeing the commercial loan portfolio have admitted that Bancorp repeatedly engaged in this fraudulent practice.

19.     Defendants, Betsy Cohen and Daniel Cohen ran the operation and received a copy of "every single credit approval memo."

20.     Betsy Cohen and Daniel Cohen directed and approved all transfers of funds within the bank and between borrowers.

21.     Decisions about what loans to send to the workout group "all would have been handled by senior management", and would not be sent until "upper management", i.e. Betsy Cohen and Daniel Cohen, decided it was time.

22.     Betsy Cohen and Daniel Cohen had first-hand knowledge of the loans that Bancorp made, and the loans that Bancorp was covering up.

**Bancorp's Inducement**

23.     Sometime prior to 2010, Bancorp, Betsy Cohen and Daniel Cohen devised a scheme to lure in new borrowers to take over non-performing loans to avoid having to formally default these loans, and to improve the appearance of its balance sheets to its regulators and shareholders.

24.     Defendants Betsy Cohen and Daniel Cohen orchestrated the scheme by instructing Bank agents to fraudulently induce Mr. Fish into partnering with the Bank and taking on projects for Bancorp's benefit.

25.     The scheme was based on new loans to Mr. Fish from Bancorp to cover Bancorp's existing delinquent non-producing loans on properties taken over by Mr. Fish.

26.     Specifically with regard to Mr. Fish, Bancorp, Betsy Cohen and Daniel Cohen, had a plan to induce Mr. Fish to take over under-valued projects secured by the Bank's excess loans so that the Bank could fraudulently, publicly report profits, and earnings, and to use Mr. Fish as a new borrower and provide mortgage loans to develop new commercial properties and then divert funds from those properties to pay-off or support Bancorp's other delinquent loans

**MilenniaProject**

27.     The first project in this scheme was a 2010 commercial development in Orlando known as Milennia Expo, which was to be developed and leased to Toys R Us ("TRU") and Dicks Sporting Goods ("DSG").

28.     At Bancorp's insistence Mr. Fish's partnered with another Bancorp borrower for this project, who at that time had several troubled mortgage loans with Bancorp ("Troubled Borrower").   Bancorp's plan was to lend the partnership after completion of the development sufficient funds to pay for land acquisition and construction, plus an additional $1,000,000 for Mr. Fish to purchase the Troubled Borrower's partnership interest, all secured by a mortgage on the project.

29.     Bancorp conditioned the partnership loan on taking Mr. Fish's $1,000,000 partnership purchase payment and applying it to another Bancorp delinquent mortgage loan on a Miami Beach office building, owned by a company controlled by the Troubled Borrower, which along with sale proceeds, would be enough to pay-off off Bancorp's office building loan in full.

**Key West and Alafaya**

30.     Bancorp's next bad commercial mortgage loan that Bancorp was desperate to cover-up was in Key West, Florida for a commercial marina ("Marina").

31.     Marina is currently owned by UP Development Key West Holdings, LLC ("UP Key West Holdings"), a single-member Florida Limited Liability Company, owned and controlled by Mr. Fish.

32.     On January 6, 2017, UP Key West Holdings filed with the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, Case Number: 6:17-bk-00090-CCJ, its voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 case.  No trustee has been appointed and the Debtor continues to operate its business and manage its property as a debtor-in-possession under §§1107(a) and 1108 of the Code.

33.     UP Key West Holdings' principal asset is the Marina.

34.     The Marina includes 25 boat slips and a 5,000 square foot industrial warehouse occupied by Fishman Seafood, LLC., a seafood processor and distribution company.

35.     Prior to UP Key West Holdings becoming owner of the Marina, WSG Key West Holdings, LLC ("WSG"), an entity controlled by Troubled Borrower, owned and operated the Marina.

36.     In 2008, Bancorp had loaned WSG over $14,000,000 for the acquisition and renovation of the Marina (the "Original Loan").

37.     As part of the Original Loan, Bancorp was required to maintain a $1,500,000 debt service reserve.

38.     However, it appears that this never occurred and Bancorp has never applied the $1,500,000 to the Original Loan.

39.     Although Bancorp's Original Loan exceeded $14,000,000 in 2008, by 2010 the Marina was nearly vacant, in complete disrepair, utterly non-performing, and virtually worthless.

40.     Bancorp needed a new borrower to take over the Marina to repair the property and to justify new loans from Bancorp for that purpose.  However, even with a new borrower, the Marina had little operating revenue to carry all of its loans.

41.     In order to provide a source of revenue for its Marina loan, Bancorp's plan was to provide financing for the development of vacant land in Orlando, known as "Alafaya", owned by the Troubled Borrower that was subject to a delinquent mortgage loan held by another lender.

42.     Mr. Fish had gotten both TRU and DSG interested in leasing the Alafaya project, and Bancorp agreed to provide financing to take out the prior loan and pay for the cost of development and construction.  Bancorp required that the Troubled Borrower allow Mr. Fish become a partner in the project.

43.     Mr. Fish, trusting and believing Bancorp, partnered on the Alafaya project only to learn that Bancorp conditioned to deal to require that $300,000 per year be diverted from the Alafaya net rents and applied to the Marina loan debt service.

44.      To complete its plan, Bancorp directed WSG to sign over the Marina to Mr. Fish subject to the Bank's mortgage loan, even though the value of the property was far less than the amount of the loan.

45.     In 2012, Mr. Fish acquired all membership interests in WSG. Upon finalizing his acquisition of WSG, Mr. Fish amended its articles of organization and effectuated a name change from WSG Key West Holdings, LLC to Up Development Key West Holdings, LLC.

46.     Following the WSG acquisition, UP Key West Holdings set out to repair and renovate the Marina Property. Despite the fact that the Marina was severely overleveraged, Bancorp offered to modify the Original Marina Loan and make two additional loans to Up Development Key West, LLC ("Up Key West"), the sole managing-member of UP Key West Holdings, to fund Marina renovations.

47.     On March 12, 2012, Up Key West executed and delivered a promissory note in the amount of $1,500,000 to Bancorp ("Note A"). Note A was followed by an additional loan facility provided by Bancorp in November 2012 in the amount of $4,000,000 ("Note B"). As security for Note B, Up Key West executed and delivered a Commercial Security Agreement.

48.     In addition, Bancorp required that Mr. Fish guarantee the $4,000,000 Marina loan with the assurance that because Mr. Fish was willing to come in and help renovate and refurbish Key West, the guarantee would never be enforced, which Mr. Fish believed and relied upon.

49.     Unbeknownst to Mr. Fish, Bancorp was only obtaining the guaranty for regulatory purposes so Bancorp could continue to cover up its fraud.

50.      As the rents from Alafaya tenants commenced, Bancorp began diverting funds to pay down the Marina Loan in accordance with its plan. Unfortunately, the diverted funds of $300,000 per year were far less than was needed to service the Marina Loans. In fact, the annual cash flow from Alafaya never achieved $300,000.

**Fashion Square Mall Loans**

51.     At the same time as the Alafaya deal was completed in spring 2012, Bancorp, Betsy Cohen and Daniel Cohen became aware that Mr. Fish was interested in purchasing the Fashion Square Mall.

52.    Bancorp representatives originally offered to make a $32,000,000 loan to finance Mr. Fish's $41,000,000 acquisition of the Mall ("Mall Loan") from PREIT, a real estate investment trust with offices in Philadelphia, Pennsylvania.

53.    While Mr. Fish had other financing options and opportunities, Mr. Fish abandoned those options when Bancorp with the approval and direction of the Cohens, offered to finance the entire purchase price, which had been reduced to $34,700,000.

54.    In order to induce Mr. Fish into signing personal guaranties of the Mall Loans, the Bank promised Mr. Fish that they needed Mr. Fish to sign guaranties as a formality.

55.    The Bank always assured Mr. Fish, that the guarantees would never be enforced and that the guaranties were not enforceable.

56.    Despite the fact that Fashion Square had no assets, and was created solely to acquire the Mall, Bancorp increased its proposed Mall Loan to $35,000,000, which was to be structured as one loan for $31,000,000 and one loan for $4,000,000.

57.    Bancorp eagerly provided loans in excess of the purchase price of the Mall.

58.    At closing in February 2013 Mr. Fish needed an additional $2,000,000 for closing costs, and Bancorp advanced the money, in addition to the $35,000,000 advanced for the acquisition, from its $4,000,000 Marina loan facility under which $2,000,000 had not yet been advanced for the Key West property.

59.    Fashion Square was formed as a single-member Florida Limited Liability Company by Mr. Scott Fish on April 13, 2012 for the purpose of acquiring and redeveloping the Orlando Fashion Square Mall ("Mall"), an 80-acre mixed-use development located near downtown Orlando. The Mall includes a two-story indoor shopping mall consisting of over

1,000,000 square feet of leasable space. The Mall is anchored by Dillard's, JC Penny, Macy's and Premiere Cinemas and a number of adjacent parcels.

60.    Knowing that the Debtor would be acquiring Fashion Square with the intent to add additional retail, restaurant and lodging concepts to the 44 year old landmark property, Bancorp agreed to support the redevelopment and loan the Debtor the requisite funds.

61.    At the February 2013 closing of Fashion Square, the Debtor executed and delivered two promissory notes to Bancorp bearing an effective date of February 12, 2013. The first note in the amount of $31,000,000.00 ("Original Note A") was to mature on March 1, 2015 with an option for borrower to extend the maturity date of the note to March 1, 2016. The second note in the amount of $4,000,000.00 ("Original Note B") was to mature on March 1, 2014, (collectively "Fashion Square Loans").

62.    The plan hatched by Bancorp and the Cohens was to finance Mr. Fish into ownership of the Mall and then divert $50,000 per month from the rents to apply to the Key West loan which was set forth in the Lockbox Agreement.

63.    Fashion Square leases the land upon which the shopping mall is constructed by virtue of a land lease originally executed in 1969.

64.    Pursuant to the Fashion Square Loans, Bancorp controlled all of the revenue generated from Fashion Square which went directly from the tenants to a Bancorp controlled Lock Box at Wells Fargo Bank.

65.    The Debtor did not have access to the Lockbox and was solely dependent on Bancorp to disburse, apply and escrow the funds as required by the Fashion Square Loan documents.

66.     Pursuant to Article 2, Section 4 Lockbox Controls of the Loan Agreement, Bancorp was required to apply the rent collected by Bancorp first to the debt service on the Fashion Square loans.  Then, before any provision for Mall expenses, divert $50,000 per month to the Key West loan.  Next, Bancorp was required to escrow $90,000 a month "to deposit in the Real Estate Tax and Insurance Reserve Account."

67.     Bancorp was required by the Fashion Square Loan Documents to escrow $90,000 per month before Bancorp paid the Debtor the monthly $390,000 for operating expenses and the monthly $33,333.00 for a management fee.

68.     Bancorp never disbursed $33,000 to the Debtor to pay the Management Company a management fee.

69.     However, it is obvious with the real estate taxes on Fashion Square remaining unpaid for 2015 and 2016, that Bancorp has failed to escrow the $90,000 required monthly real estate taxes.

70.     From the inception of the Fashion Square Loan until September 2016, at $90,000 a month, Bancorp should have escrowed a total of $3,690,000 for the Real Estate taxes.

71.     One thing is clear, Bancorp cannot account for the $3,690,000 that it was required to escrow pursuant to the Fashion Square Loan Documents.

72.     However, it is also clear that Bancorp did not escrow the money as required by the Fashion Square Loan Documents and used the $3,690,000 for other purposes in breach of the Fashion Square Loan Documents.

73.     In conjunction with the Fashion Square Loans Bancorp required a Collateral Assignment Of Management Agreement And Subordination Of Management Fees ("Collateral

Assignment") to be entered into between Bancorp, Fashion Square and UP Management—Fashion Square, LLC—the property manager, a company formed by Mr. Fish.

74.     Bancorp knew from the inception of the Fashion Square Loans and its required Collateral Assignment that "Borrower employed Property Manager exclusively to rent, lease, operate and manage the Property and Property Manager was entitled to certain management fees (the "Management Fees") thereunder." *See Collateral Assignment*.

75.     The Debtor never paid the Property Manager the $33,000 management fee.

76.     Moreover, Bancorp <u>never</u> terminated the Property Management Agreement.

77.     In fact, Bancorp approved, and controlled all funds it transferred to the Debtor.

78.     All rent proceeds generated from the Debtor have always been in Bancorp's control.

79.     Bancorp unilaterally made all of the decisions as to how the proceeds from the Debtor would be distributed.

80.     The Debtor could not have, and did not, cause or utilize rent proceeds of the Debtor to pay un-related loans. This would have been an absolute impossibility because Bancorp always maintained sole control of the rent proceeds.

81.     Additionally, Bancorp required Fashion Square to execute a Deposit Account Control Agreement. The agreement required that "all rents and other income, proceeds and revenue generated from or through the Project ("Project Income") shall be directed to and deposited in the Depository Account. . . . **which is under the control and dominion of Lender**." (emphasis added) *See Deposit Account Control Agreement*.

82.     Pursuant to the Fashion Square Loan Documents, Bancorp fully controlled the Debtors' rents, other income, proceeds and revenue from the Mall.

83.     Bancorp specifically controlled the monthly disbursements through its Loan Documents under which the monthly sum of $390,000 was to be paid "to the Manager. . . . to pay all operating expenses of the Project, . . . .and a management fee to Manager in an amount not to exceed $33,333,33 per month."

84.     Bancorp was anxious to have Mr. Fish complete the acquisition because Bancorp desperately needed the cash flow from the Mall to support the Key West loan, thereby covering up the real nature of Bancorp's finances.  Therefore, Bancorp was willing to provide all of the funds necessary for the acquisition at any expense.

85.     Bancorp requested that Mr. Fish guaranty 50% of the $31,000,000 loan and 100% of the $4,000,000 loan; however, Bancorp, once again, assured, and promised, Mr. Fish that the guaranty was only for documentation purposes and the Bank would never hold Mr. Fish liable on the guaranty.

86.     Bancorp's Blocked Account Control Agreement of February 12, 2013 for the Mall Loan provided that all rents be paid **directly** to a Bancorp controlled bank "lock-box" account with a waterfall provision of how Bancorp applied the rents.

87.     The Debtor did not collect any of the rents directly.  Bancorp fully controlled this process and the money.

88.     Bancorp has failed to provide the Debtor with a monthly accounting of the lockbox account.

89.     Bancorp took $50,000 per month from the Fashion Square rents and applied it to the Key West loan in addition to other Bancorp loans.

90.     Bancorp additionally charged unsubstantiated fees and unapproved "fees" rather than apply the funds to the loan principal.

91.     Bancorp failed to escrow funds for real estate taxes, insurance premiums and other expenses for the Mall.

92.     Bancorp was consistently late in making the monthly disbursements to the Debtor, which necessitated the Debtor to seek loans and additional temporary funding in order to timely pay the monthly operating expenses.

93.     At the time of the Fashion Square Loans, Bancorp engaged CBRE to prepare a valuation report that valued the Fashion Square Mall at $39,100.00

94.     To keep Mr. Fish active and personally invested in the projects whose cash flow was being stripped to support the Bank's non-productive bad loans, Bancorp fraudulently and intentionally, promised Mr. Fish to loan more funds and cooperate with Mr. Fish's additional projects and the re-development of Fashion Square Mall.

95.     However, Mr. Fish and Fashion Square only recently learned that Bancorp never had any intention of keeping the bulk of those promises.

96.     The re-development planned for Fashion Square Mall and approved by Bancorp, included, but was not limited to:

a.   A seven-story hotel on top of the mall;

b.   Manicured streets with offices and shopping areas.

c.   Nearly 600 new apartment units;

    d.   87,000 additional square feet of commercial space.

97.    On the basis of Bancorp's support for these development plans, the Debtor and Mr. Fish invested considerable time and money to pursue these opportunities.

98.    But Bancorp had no intention of following through, but was merely stringing the Debtor and Mr. Fish along.

99.    In March 2013, Mr. Fish began discussions with hotel developers for the construction of a hotel at the Mall.  These discussions continued with the knowledge and support of Bancorp.

100.    At the beginning of May 2013, with Bancorp's knowledge and support, Fashion Square, through Mr. Fish, made a presentation to Starwood Hotels, and a soil report for a multistory building at the Mall was delivered shortly thereafter.

101.    On May 13, 2013, Starwood delivered a letter of intent to Mr. Fish authorizing the operation and management of the hotel under the Starwood name.

102.    The Starwood Hotel that was to be developed was a 160-room Element by Westin hotel with suites having mini-kitchens, specially designed workspaces and entertainment centers, a pool deck and a fitness center.  It was to be LEED-certified by the U.S. Green Building Council.

103.    The Debtor continuously provided Bancorp with updates and information regarding the redevelopment, and during 2013, Bancorp continued to support the Debtor.

104.    From May 2013 through August 2013, Fashion Square and Mr. Fish spent significant time and money getting the plans for the hotel prepared and submitted for approval.

105.    In August 2013, the hotel development was approved by the City of Orlando, and numerous public announcements were made.

106.    By August 2013, Mr. Fish, on behalf of the Debtor, had discussions with Regional Capital Corp regarding EB-5 financing for the hotel.

107.    Mr. Fish reviewed those ongoing discussions with Bancorp who told Mr. Fish that the EB-5 financing would take too long and that Mr. Fish should obtain the necessary financing from Bancorp and that Bancorp would agree to loan the Debtor the necessary funds.

108.    Through October 2013, the operating agreement for the development partnership and the lease for the hotel were still being negotiated.  Negotiations for hotel and other additional Mall financing also continued with Bancorp.

109.    Based on Bancorp's assurance of financing for the hotel, Mr. Fish invested millions of dollars to relocate and terminate Mall tenants and demolished the front of the Mall where the hotel was to be located.

110.    Mr. Fish invested even more money into the re-development of the Mall to include a bowling alley, arcade and ice-cream shop, and the addition of a weekend farmers' market.

111.    In November 2013, Bancorp obtained another appraisal of the Fashion Square Mall, which gave an As Is value as of August 24, 2013 of $45,500,000.

112.    By the end of 2013, Bancorp agreed to loan Fashion Square more money for the re-development of the Mall and on December 11, 2013, the Bancorp Mall loans were amended. Note A was increased to $36,300,000 and the maturity date was extended to January 1, 2016

with an extension option to January 1, 2017.  Note B had its maturity date extended to January 1,

2016 and an extension option added to January 1, 2017.

113.    However, Bancorp's lending was not without a condition.  In the amended loan

agreement, in exchange for the additional loan, Bancorp required a 45% "kicker" in the form of a

partnership participation in any sale proceeds or refinancing proceeds from the Mall, which when

received were to be applied to the Key West loan.

114.    Of the $5,300,000 additional Bancorp loan proceeds, $200,000 were for closing

costs and the balance was utilized expenses of the Hotel development.

115.    In connection with this additional loan, and with Bancorp's renewed promises that

the guaranties were not valid, Bancorp required in exchange, that Mr. Fish agree to pledge his

membership interest in the Debtor to the Bank, which he did.

116.    On March 3, 2014, Bancorp emailed Mr. Fish that it appointed Kristen Althoff

specifically to act as the lead underwriter for the hotel loan.

117.    Bancorp confirmed in writing that it was looking forward to working with Mr.

Fish's to get the hotel deal finalized.

118.    In April 2014, the Debtor submitted a request to Bancorp for approval to amend

the Fashion Square Mall DRI Development Order to provide for the hotel.

119.    Without hesitation, Bancorp approved the amendment.

120.    In December, 2014, in response to Bancorp's request Mr. Fish sent detailed hotel

information (pro forma and construction information) to Bancorp.

121.    Unbeknownst to the Debtor and Mr. Fish, in the latter part of 2014, Bancorp's commercial loan portfolio had become so toxic that Bancorp decided to start selling its commercial loan portfolio and discontinue new commercial lending.

122.    Without the Debtor's or Mr. Fish's knowledge, Bancorp and the Cohens conspired to use Mr. Fish and his companies to continue carrying some of Bancorp's bad commercial loans until Bancorp was able to transfer or sell them.

123.    In order to make this happen, Bancorp continued to make commitments to the Debtor and Mr. Fish for as long as it would take for Bancorp to dispose of the non-producing commercial loans which were connected to Mr. Fish.

124.    On January 18, 2015 Bancorp e-mailed Mr. Fish stating that Bancorp is "planning to layout a program for you this week in terms of the new underwriting", which was discussed numerous times, and Bancorp again promised that additional Mall financing would be approved.

125.    Mr. Fish responded by making a formal loan request on January 22, 2015.

126.    On February 6, 2015, Mr. Fish sent more information to Bancorp regarding the hotel and pending new leases in accordance with the Bank's requests.

127.    Mr. Fish specifically explained to Bancorp, that time was of the essence, and that that loan request made by him on January 22, 2015, as previously discussed, required the following funding:

- $850,000 for the Mall to be used in connection with JC Penney/Sephora
- $25,000,000 for the Mall for new hotel construction
- $4,500,000 for the Mall in connection with a new Best Buys' lease
- $10,000,000 for the Mall in connection with the buyback of the parking lot pad from Macys under its lease and additional rental from Macys

128.    Despite having already provided the information, on February 2, 2015 Mr. Fish received correspondence from Bancorp's attorney, asking for details of the new loan request, including the hotel.

129.    On February 5, 2015, counsel for Mr. Fish immediately responded with details of loan requests now totaling $44,000,000 adding $900,000 for delinquent real estate taxes, $3,000,000 for tenant improvements for vacant space from the hotel demolition, reducing Best Buys new tenant improvement costs to $2,500,000, $1,400,000 for Olive Garden tenant costs, and $1,250,000 for unpaid contractors for tenant relocation.

130.    On February 18, 2015, Mr. Fish again advised Bancorp that because of Bancorp's delay, the Mall was losing all of its new tenants, losing money and incurring substantial damage.

131.    By March, 2015, Bancorp engaged another law firm who once again requested information from Mr. Fish regarding the redevelopment details.

132.    At this time, Bancorp was also engaged in discussions with Mr. Fish regarding the plans for new Mall tenants on the Macys parking pad.

133.    Macys had offered to sell its parking pad to the Debtor and to increase its rent in exchange for $10,000,000 to be used to improve its store at the Mall.  Mr. Fish provided all of this information to Bancorp, and Bancorp indicated that it remained committed to provide the necessary funding and supported the redevelopment plan.

134.    Mr. Fish had various tenants interested in ground leasing portions of the parking pad.

135.    The Macys store upgrade was to be twinned with the construction of the hotel. Knowing that additional funding would be necessary in order to proceed with the Macys

transaction as well as the hotel transaction, in April 2015, Bancorp met Mr. Fish along with Mr. Fish's representatives in New York with Macys to continue making progress for the additional loan.

136.    Again, all representations made by Bancorp indicated that Bancorp supported Mr. Fish's redevelopment efforts and plans.

137.    Bancorp once again began dragging its feet, and the significant delay by Bancorp in closing the new Mall loans that were promised resulted in numerous proposed new tenants rescinding their letters of intent.

138.    Then, in May 2015, without any warning or prior indication, and completely contrary to all of the representations and assurances made by the Bank, Bancorp requested that Mr. Fish prepare a contingency plan for the Mall without the Hotel.

139.    Despite knowing that Mr. Fish had invested millions of dollars into the Mall re-development, had LOI's, contracts, plans, etc., on May 11, 2015, Bancorp and the Cohens, furthering their conspiracy and extortion plan, for the first time Bancorp told Mr. Fish that it would require a pledge of Mr. Fish's other interests to provide additional security for the Mall loans.

140.    At the end of May 2015, while refusing to proceed forward with the original funding as promised, Bancorp, proposed providing an additional $2,000,000 loan to the Mall for delinquent real estate taxes ($764,000), delinquent ground lease rent ($140,000), an obligation to JC Penney ($788,000), and principal payments to be applied to the Mall loan of $438,000, which new loan would be added to the Note B ($4,000,000 loan).

141.    All of the obligations to be paid from the additional loan had only occurred because of continuing loss of tenants due to Bancorp's delay and failure to live up to its promise of financial support for the various Mall projects.

142.    On May 27, 2015, Bancorp proceeded with its extortion plan and sent Mr. Fish a negative pledge agreement of Mr. Fish's interests in his other developments.

143.    The demand was that either Mr. Fish execute the negative pledge agreement, or Bancorp would not loan the money.

144.    Specifically, Bancorp required Mr. Fish to pledge his interests in his bank accounts, closely held entities, wholly-owned operating entities, and commercial real estate in order to insure that Mr. Fish sold the Alafaya property as directed by Bancorp.

145.    Three of the wholly owned operating entities included by Bancorp were the management, security and maintenance companies for Fashion Square Mall.

146.    Bancorp always knew, from the inception of the Mall Loans, that Mr. Fish was the manager of UP Management Fashion Square and Mr. Fish's brother, Joseph Fish was the manager of FSM Security and FSM Maintenance.

147.    Bancorp, controlling all of the funds disbursed from the Lock Box to the Debtor, dictated how much the Debtor was allowed to receive for Mall expenses, and therefore, in effect, Bancorp paid UP Management Fashion Square, FSM Security and FSM Maintenance.

148.    Left without a choice, having already lost millions of dollars as a result of Bancorp's delays, Debtor signed the loan documents on May 29, 2015.

149.    On June 8, 2015 Bancorp funded the advance.

**<u>Sale of Ground Parcel To Bancorp</u>**

150.    On or about October 27, 2015, Bancorp purchased from the Debtor a parcel of ground contiguous to the Fashion Square Mall property ("Bancorp Purchase"), which had been subject to the Bancorp mortgage.

151.    In September 22, 2015 correspondence, it was confirmed that Bancorp would use $1,000,000 from the proceeds of the Bancorp Purchase and apply it to the Fashion Square Mall Loan to reduce the principal balance, and the balance of proceeds of $700,000 was to be used by Bancorp to pay various vendor bills from the Mall.

152.    By October 15, 2015, Bancorp advised the Debtor that it was delaying closing on the Bancorp Purchase, and on October 16, 2015, the Debtor threatened to terminate the Agreement of Sale because of various promises which had been made to unpaid Mall vendors based on the assurances of Bancorp that the sale would be closed.

153.    On October 26, 2015, Bancorp, through its attorney, requested that vendor payments and debt payment  from the sale proceeds not be separately shown on the closing statement.

154.    The October 27, 2015 closing statement shows the agreement by Bancorp to utilize $1,545,952.60 of net proceeds to be applied to the principal of the Fashion Square loan.

155.    However, despite the Debtor's repeated requests to Bancorp to show that it applied the $1,545,952.60 to the Fashion Square Mall loan principal, Bancorp has always refused.

156.    Additionally, based upon Bancorp's recent pleadings showing the loan balance, it is clear that Bancorp has never applied the $1,545,952.60 as required, once again demonstrating Bancorp misappropriated and fraudulently transferred the Debtor's money.

157.    The Fashion Square Loan is not in default because Bancorp did not apply the $1,545,952.60 proceeds as required.    Instead Bancorp fraudulently transferred the Debtor's money.

**Bancorp's Continued Fraud and Conspiracy**

158.    Apparently pressured by the SEC and regulators Bancorp spent the balance of 2015 negotiating the sale of the Alafaya properties back to The Troubled Borrower and paying off the Bancorp Alafaya loans.

159.    Although Mr. Fish's agreements with his partner required a sale price of $750,000 to sell his partnership interest back to him, Bancorp forced Mr. Fish to accept a price of $200,000 so that the Bank could get the Alafaya loan off its books.

160.    On December 2, 2015, Bancorp once again backing out of its promises, gave Mr. Fish an ultimatum that the Bank would only provide additional funds to fix up the Mall if on Mr. Fish finished the Alafaya sale.

161.    In December 2015 Bancorp sent Mr. Fish forms affirming the intention to borrow for signature by the guarantor dealing with the Alafaya loans, Key West loans and the Mall loans.

162.    The sale of Alafaya and payoff of the Bancorp loan occurred in the early part of 2016.

163.    In January 2016 drafts of amended and restated loan documents were sent out from Bancorp showing a Mall loan amount of $42,163,813.    The documents provided that both Note A and Note B would mature on January 1, 2017.    There were to be interest only payments

through July 1, 2016 and principal and interest payments thereafter to the date of maturity based on a 25 year amortization.  No additional funds were loaned at this time.

164.    Bancorp required that it maintain the lockbox waterfall requirements benefiting the Key West property of $50,000 per month, even though at that time 2015 real estate taxes for the Mall were unpaid and that money should have been used to pay the Mall's real estate taxes.

165.    In March, 2016, Bancorp and Mr. Fish met to discuss the resolution of the Key West loans.  In the meantime, during April, 2016 the Mall lockbox account at Wells Fargo into which the Mall rents had been paid was shut down because of overdrafts by Bancorp.

166.    Thereafter Bancorp attempted to open a new lockbox account at Valley National Bank which was unsuccessful because of Bancorp's failure to provide necessary information.

167.    In April, 2016, Bancorp sent Mr. Fish a letter promising the release of Mr. Fish's Key West guarantees in exchange for Mr. Fish's cooperation in the sale of Key West to Monroe County.

168.    By May 2016, with the Mall's financial condition deteriorating precipitously because of Bancorp actions and inactions, the Key West waterfall provision in the draft of the amended and restated loan documents for the Mall was taken out.  However, it was already too late and irreversible damage to the Mall had already occurred.

169.    Faced with this situation, and with no other options, Bancorp forced the Debtor to enter into the amended and restated loan documents in June 2016 ("Amended Mall Loan").

170.    Bancorp took advantage of its superior bargaining position, by imposing additional economic constraints upon Debtor, which were intended to protect Bancorp's all-upside loan arrangement with the Debtor.

171.    While not providing additional funding, the amended documents extended the maturity date of the loans to January 1, 2017, giving Mr. Fish the opportunity through the sale proceeds from the residential sale with Trammel Crow discussed below, to carry the Mall loans through 2017 and pay off the delinquent 2015 real estate taxes.

**Residential Development of the Mall**

172.    Part and parcel to the Mall redevelopment plan, in the fall of 2013, Mr. Fish began negotiations with a residential builder to develop certain unused Mall property for apartment units.  Since the builder needed fee title to the property, Mr. Fish commenced negotiations with the Mall's ground lessor  MMM Lakewood, LLLP ("MMM") to purchase fee title to the property.  All of this was done following discussions with and approvals from Bancorp.

173.    By the beginning of 2014 the negotiations had ended because of Mr. Fish's inability to get either a high enough price from the builder or a low enough price from the ground lessor.  Complicating the negotiations was the need to retain a part of Mall property contiguous to the residential development which was leased by Debtor to Anthem College.

174.    In early 2014, Anthem College declared bankruptcy, and by the end of the summer of 2014 it was clear to Mr. Fish that a new tenant would not be forthcoming for this property.

175.    At that time, a new residential builder expressed interest in the project at a higher price and negotiations began again, with the knowledge and blessing of the Bank's representatives.  They told Mr. Fish that any transaction which would improve the neighborhood for the Mall and produce a profit which could be applied either to Mall expenses or to the Mall

loans, would be welcome. Once again these negotiations did not work out because of price issues.

176.    However, by the spring of 2015 another builder, Trammell Crow Residential ("TCR") showed interest at a price high enough to produce a significant profit at closing.

177.    Bancorp participated in the negotiations with TCR and Mr. Fish.

178.    Once again, assurances were given by Bancorp that this transaction was in Bancorp's best interest, and Bancorp promised that at closing it would release the sale property from its mortgage lien in exchange for the net proceeds being applied to Mall expenses or the Mall loans.

179.    On January 12, 2016, Mr. Fish emailed Bancorp giving more details of the proposed transaction.

180.    There are two parcels that the Debtor has under separate ground leases and intended to purchase from MMM. Both of these parcels are subject to the Bancorp mortgage.

181.    Via a separate and simultaneous transaction, the Debtor intended to convey these two parcels to Maple Multi-Family Land, SE, L.P., a Delaware limited partnership, which is an affiliated entity with TCR (the "TCR Transaction").

182.    The plan was MMM sells to the Debtor for 5.790 million, the Debtor sells to TCR for 8.026 million, and the difference was to be used to demolish the property, and specifically to pay the real estate taxes, and other Mall-related expenses.

183.    After the Amended Mall Loan was executed, Bancorp continued to represent that it supported the TCR Transaction.

184.    After conversations with Bancorp directing Mr. Fish to sign the contracts with TCR, on January 26, 2016, Mr. Fish emailed Bancorp saying "per your direction I am signing the contracts".

185.    In February 2016, at Bancorp's direction, Fashion Square executed a contract with TCR obligating the transaction to close, and the sale to TCR, to occur no later than October 31, 2016.

186.    Agreements of sale were also signed in February, 2016 with MMM to purchase fee title to the property to be sold to TCR.

187.    The Debtor relied upon Bancorp's representations and actions and moved forward with the TCR Transaction as planned.

188.    Starting around September 2016, draft closing statements were shared with Bancorp showing how the money was to be disbursed, and revisions were made to please Bancorp.

189.    The portion of the Mall property which is the subject of the TCR Transaction comprises 4,566 acres of the total Mall property of 45,776 acres.  Thus, the Debtor was asking Bancorp to release only 10% of its mortgaged property plus a parcel used as a retention basin.

190.    The land to be released is vacant and produces no rental income for the Mall.

191.    The initial closing was to take place in early May 2016, but TCR terminated the contract due to voluminous title issues and the $100k deposit was returned.

192.    Since the first amendment of the TRC transaction, the contract has been amended eleven additional times (12 total amendments), but these amendments only moved the closing

date back as the Debtor attempted to obtain the necessary releases from Bancorp, as promised by Bancorp.

193.    The current 12th amendment expires January 30, 2017. TCR has continued to work aggressively on land entitlements and permitting, with MMM's approval as necessary, in anticipation of Bancorp releasing the property, and TCR was often included in communication with Bancorp or was in direct communication with Bancorp.

194.    Substantial time, effort and funds in excess of $1,000,000 were spent by both Mr. Fish and TCR to obtain governmental approvals for the project, which were granted by summer 2016.

195.    After a closing date was set on the TCR deal on June 29, 2016, Bancorp emailed Mr. Fish requesting a $250,000 interest payment for Key West, which the Debtor has now discovered was necessary for Bancorp's books and reporting and to keep the Key West loan current.

196.    After months of discussions, on September 20, 2016, Bancorp, pulled the rug out from underneath the Debtor and affirmatively stated that it refused to release the sale property from its mortgage lien as originally promised.

197.    Bancorp's failure to perform intentionally interfered with Fashion Square's contract with TCR.

198.    On October 17, 2016, TCR sent Fashion Square a default letter threatening return of its deposit and/or specific performance.

199.    In response to Bancorp's flagrant material breaches, fraud and conspiracy, the Debtor stopped making payments under the Mall Loan Documents.

200. Prior to September 2016, the Debtor timely made all Mall Loan payments to Bancorp.

201. Additionally, based upon the money that Bancorp should have been escrowing and applying to the Mall Loan, the Debtor is not in default and should have a credit.

202. In October 2016, Bancorp rushed to obtain a new appraisal on Fashion Square Mall.

203. On October 4, 2016, Bancorp issued an alleged default notice to the Debtor, alleging that $42,196,455.37 in addition to real estate taxes was still owed on the Fashion Square Mall loan, at which time Debtor discovered that Bancorp clearly misappropriated and/or fraudulently transferred the funds from the Debtor's lock box account, including the real estate tax escrows, as well as $1.5mm proceeds of the Bancorp Purchase, in addition to other unknown amounts.

204. Neither the Debtor, nor Mr. Fish ever knew that Bancorp was not complying with the loan documents on any of the transactions.

205. Neither the Debtor nor Mr. Fish had actual or constructive knowledge at the time it signed any loan amendment, waiver, or release that Bancorp was committing fraud, in breach of the Loan Documents, misappropriating and fraudulently transferring funds.

206. Moreover, the Debtor and Mr. Fish never intended on relinquishing their rights against Bancorp.

207. Bancorp never attempted to default the Debtor until October 2016.

208. Therefore, prior to that time the Debtor never had any reason to believe that Bancorp fraudulently induced the Debtor and Mr. Fish into these loan deals in order for

Bancorp to cover up their bad loans and mis-apply and mis-appropriate money from the Debtor.

209.    After Bancorp became aware that the Debtor and Mr. Fish recently uncovered Bancorp's conspiracy, fraud and insider trading, including, but not limited to, what is discussed in:   https://medium.com/@larrywabrams/the-bancorp-existential-crisis-triggered-by-behavioral-finance-hedge-fund-8958507cc2db#.b1px17t3g, Bancorp rushed to file a foreclosure action against the Debtor and Mr. Fish.

210.    Upon information and belief, Bancorp and the Cohens intentionally, drove down the value of the Fashion Square Mall and backed out on its promises so that Bancorp could sell or transfer the Mall into a real estate investment trust owned and/or controlled by The Cohen's as they have done in the past.

211.    Examples of the Cohens' activities are documented in articles:


●     https://www.americanbanker.com/news/the-bancorp-sells-nearly-267m-of-commercial-loans
Where Bancorp sold $267 million dollars of its commercial loans to Walnut Street 2014-1 Issuer, LLC.
●     https://www.benzinga.com/news/14/12/5113864/8-k-filing-shows-bancorp-closes-on-sale-of-commercial-loan-portfolio-to-walnut-st
Where Bancorp sold $209 million dollars of its commercial loans to Walnut Street 2014-1 Issuer, LLC.


212.    The CEO of Walnut Street 2014-1 Issuer, LLC. is Ken Tepper, who is an agent of Bancorp.

213.    Ken Tepper also happens, coincidentally or not, to be one of the individuals who on behalf of Bancorp, has been in constant contact with the Debtor and Mr. Fish regarding the Debtor's relationship with Bancorp.

214.    Upon information and belief The Cohen's are directly or indirectly involved with Walnut Street 2014-1 Issuer, LLC.

215.    Daniel and Betsy Cohen were sued individually regarding its securities violations and REIT regulatory violations in *In Re RAIT Financial Trust Securities Act*, in the United States District Court Eastern District Of Pennsylvania, Case Number: 2:01-CV-03148.

216.    Bancorp and the Cohen's scheme was to string the Debtor and Mr. Fish along long enough to make them believe that Bancorp would follow through with its promises, in addition to giving Bancorp time to cook its books and not disclose the sources of payment of funds used to support its delinquent loans.

217.    Upon information and belief, Bancorp intended on having one of The Cohen's Chicago related management companies manage the Mall either on a temporary or permanent basis.

218.    Upon information and belief, Bancorp intended on selling the Fashion Square mall either for nothing, or for cheap, and then running it or flipping it for a significant profit.

219.    What Bancorp did not do however, was file a foreclosure action against Key West because Bancorp knows that Key West is where the conspiracy and fraud began as it relates to the Debtor and Mr. Fish.

**Breaches and Defaults By The Bank**

220.    Because of Bancorp's control over the Debtor, and the Debtor's trust and confidence in its lender, Bancorp put the Debtor in a position of dependence, inequality or lack of knowledge.

221.    Bancorp fraudulently induced the Debtor to believe that Bancorp supported the redevelopment plan and that Bancorp was acting in accordance with the Fashion Square Loan Documents.

222.    Bancorp breached the Loan Agreements by failing to properly apply and distribute the funds from the Lock Box to the loan principal, interest and real estate taxes as required by the Loan Documents.

223.    Bancorp acted in bad faith and breached its duty of good faith and fair dealing when it disclosed it would not approve the Hotel and not provide any further funding of the Mall projects.

224.    Bancorp breached its duty of good faith and fair dealing when it refused to release the sale property to TCR from its mortgage lien as originally promised.

225.    Bancorp tortuously interfered with the Debtor's contract with TCR and the numerous tenant LOIs obtained by the Debtor.

226.    Bancorp constantly encouraged the Debtor to change its construction plans, made misrepresentations regarding its intent on funding projects, while never intending to approve the change in plans, thereby inducing the Debtor to allow Bancorp to take "waterfall" money away from the Mall and have it applied to Bancorp's non-performing commercial loans rather than the Mall's real estate taxes or other Mall re-development expenses.

227.    The delays Bancorp caused the Debtor to lose tenants and lose business, and the value of the Mall continues to decline.

228.    The Debtor had millions of dollars of value in letters of intent from prospective long-term tenants, which its lost, such as, but not limited to:
    e.   Walmart

    f.  Best Buy
    g.  BJs
    h.  TGI Friday's
    i.  Forever 21
    j.  Lowes
    k.  Floor and Décor

229.    Bancorp's most recent appraisal in November 2016 valued the Fashion Square Mall at $21,000,000—less than half of the outstanding Mall Loans as a result of Bancorp's actions and inactions, including, but not limited to:

    a.  Bancorp's failure to escrow and pay the real estate taxes as required by the Mall Loan Documents;
    b.  Bancorp's misappropriation and fraudulent transfer of $1,545,952.60 from the Bancorp Closing which should have reduced the Fashion Square Loan by $1,545,952.60;
    c.  Bancorp's misappropriation and fraudulent transfer of $3,690,000, which should have been used to pay Mall real estate taxes;
    d.  Bancorp's misappropriation and fraudulent transfer of money that should have been applied to the Fashion Square loan; and
    e.  Bancorp refusal to provide an accounting as to the whereabouts of all of the money transferred from the Lock Box it controlled.

230.    Adding to its damages is the Debtor's loss of the TCR sale and the proceeds which were to be used to pay overdue loan payments and other Mall expenses, specifically including delinquent real estate taxes, which was agreed to, and approved by Bancorp.

231.    The Debtor's loan is not in default, and has never been in default.

232.    Had Bancorp properly applied the funds in the Lock Box as required under the Loan Documents, there would be a credit on the Debtor's loan account.

233.    The Bank's false promises have caused the Debtor and Mr. Fish substantial damages and have caused the severe de-valuation of the Fashion Square Mall.

## COUNT I
### (Determining extent, validity, and priority of liens)
### (Bancorp)

234.    Debtor re-asserts and re-allege paragraphs 1 through 233 above, as if fully set forth herein.

235.    This is an action to determine the validity, priority, and extent of Mortgage lien on the Debtor's property as a result of the Fashion Square Loans.

236.    Debtor is in doubt regarding the validity, priority, and extent of lien claimed by the Defendant as to the Debtor's property and other assets of the estate.

237.    Bancorp's actions and inactions as described in paragraphs 1 through 233 above, may have an effect on the validity, extent and priority of their lien.

WHEREFORE, the Debtor respectfully prays that this Honorable Court enter an Order determining validity, priority, and extent of the claims and/or liens of Bancorp against the property of the Debtor/Plaintiff; award attorney' fees and costs; and for such other and further relief.

## COUNT II
### (Subordination Of Bancorp's Claim Pursuant To 11 U.S.C. §510(b))

238.    Debtor re-asserts and re-allege paragraphs 1 through 233 above, as if fully set forth herein.

239.    This is an action to pursuant to 11 U. S. C. §510(b) to subordinate the debt represented by the Security Instruments and the Claim to below the status of general unsecured creditors.

240.    Bancorp has engaged in at least the following inequitable conduct with respect to Fashion Square:

- Bancorp's failure to escrow and pay the real estate taxes as required by the Mall Loan Documents;

- Bancorp's misappropriation and fraudulent transfer of $1,545,952.60 from the Bancorp Closing which should have reduced the Fashion Square Loan by $1,545,952.60;

- Bancorp's misappropriation and fraudulent transfer of $3,690,000, which should have been used to pay Mall real estate taxes;

- Bancorp's misappropriation and fraudulent transfer of money that should have been applied to the Fashion Square loan; and

- Bancorp refusal to provide an accounting as to the whereabouts of all of the money transferred from the Lock Box it controlled.

241.    Bancorp's conduct has injured Fashion Square, as evidenced by causing Fashion Square to detrimentally rely upon Bancorp's false and fraudulent statements which have caused Fashion Square millions of dollars in damages.

242.    The subordination of the Claim is not otherwise inconsistent with the Bankruptcy Code.

**WHEREFORE,** Debtor's respectfully request that this Court enter an order against Bancorp: (i) subordinating the Claim pursuant to 11 U.S.C. §510(b) to below that status of general unsecured creditors; and (ii) for such other and further relief as the Court deems just and proper.

## COUNT III
### (Fraudulent Misrepresentation)
### (Bancorp, Daniel Cohen & Betsy Cohen)

243.    Debtor re-asserts and re-allege paragraphs 1 through 233 above, as if fully set forth herein.

244.    Defendants, Bancorp, Daniel Coen and Betsy Cohen by and through their management, agents, employees and representatives, intentionally, or through gross negligence,

have misrepresented material facts and/or omitted material adverse facts to the Debtor to induce them to enter into the various Fashion Square Loan transactions.

245.    Defendants knew that each of the representations were false when made and its representations and/or omissions were made to keep the Debtor and Mr. Fish from discovering the materially adverse information.

246.    The misrepresentations and/or omissions were made with the intention that the Debtor would rely on the representation.

247.    The Debtor relied on the (mis)representations of Defendants to its detriment.

248.    Defendants' misrepresentations and/or omissions of material facts were solely motivated by unreasonable financial gain and/or done with the specific intent to harm.

249.    As a direct and proximate result of the misrepresentations and the Debtor's reliance upon same, Debtor suffered compensatory damages.

WHEREFORE, the Plaintiff, respectfully requests this Court to enter judgment against Defendants for:

A.    monetary damages;

B.    punitive damages;

C.    costs of suit;

D.    prejudgment and post-judgment interest, and

E.    such other and further relief as the Court may deem necessary and proper under the circumstances.

**COUNT IV**
**(Negligent Misrepresentation)**
**(Bancorp, Daniel Cohen & Betsy Cohen)**

250.    Debtor re-asserts and re-allege paragraphs 1 through 233 above, as if fully set forth herein.

251.    Defendants, by and through its management, employees and representatives, made several misrepresentations and/or omissions of material fact in its course of business dealings with Debtor and Mr. Fish.

252.    Defendants knew that the representations made to the Debtor and Mr. Fish were false or made the misrepresentations under circumstances in which Defendants should have known that the statements were false.

253.    Defendants intended that the misrepresentations and/or omissions would induce the Debtor and Mr. Fish to act and enter into the Loan Transactions.

254.    The Debtor and Mr. Fish relied, to their detriment, upon Defendant's misrepresentations and/or omissions.

255.    As a direct and proximate result of Defendant's misrepresentations, the Debtor and/or Mr. Fish, acting in justifiable reliance upon the misrepresentations and/or omissions, suffered compensatory damages.

WHEREFORE, the Debtor and Mr. Fish, respectfully request this Court to enter judgment against Defendants for:

256.    monetary damages;

A.    costs of suit;

B.    prejudgment and post-judgment interest; and

C.    such other and further relief as the Court may deem necessary and proper under the circumstances.

**COUNT V**

**(Breach Of Contract)**
**(Bancorp)**

257. Debtor re-asserts and re-allege paragraphs 1 through 233 above, as if fully set forth herein.

258. Under the Fashion Square Loan Documents was required to disburse and escrow money in accordance to the waterfall provision in the Loan Documents.

259. Bancorp was required to properly apply all funds to the Debtor's principal loan balance and escrow funds for real estate taxes and insurance.

260. Bancorp failed to adhere to the provisions of the Loan Documents and transferred money in violation of the Loan Documents.

261. Pursuant to the Closing Statement and agreement regarding the sale of the parcel of land to Bancorp, Bancorp was required to apply approximately $1.5mm to the Fashion Square Loan principal.

262. Bancorp never applied the $1.5mm to the Fashion Square Loan principal in violation of the agreements.

263. The Debtor does not have knowledge as to what Bancorp has done with the millions of dollars of funds belonging to the Debtor.

264. As a result of Bancorp's breaches, the Debtor has suffered damages.

WHEREFORE, the Debtor, respectfully requests this Court to enter judgment against Bancorp for:

A.    monetary damages;

B.    attorneys' fees and costs of suit;

C.    prejudgment and post-judgment interest, and

D.      such other and further relief as the Court may deem necessary and proper under the circumstances.

## COUNT VI
## (Fraud In The Inducement)
## (Bancorp, Daniel Cohen & Betsy Cohen)

265.    Debtor re-asserts and re-allege paragraphs 1 through 233 above, as if fully set forth herein.

266.    Bancorp made material misrepresentations and/or omissions to Plaintiffs.

267.    Bancorp knew, or should have known, that these statements were false.

268.    Bancorp, and the Cohens had a pecuniary interest in the fraud by covering up their badly delinquent loans as now admitted to by Bancorp and The Cohen's in the Investor Law Suit.

269.    Bancorp made false statements intentionally for Debtor to rely on them and induce Debtor to continue operating his real estate projects and provide for Bancorp's delinquent loans which would never have a proper loan to value ratio.

270.    The Debtor relied on the intentional, false misrepresentations and/or omissions made by Bancorp.

WHEREFORE, the Debtor, respectfully requests this Court to enter judgment against Bancorp for:

A.      monetary damages;

B.      attorneys' fees and costs of suit;

C.      prejudgment and post-judgment interest, and

D.      such other and further relief as the Court may deem necessary and proper under the circumstances.

## COUNT VII
### (Breach of Implied Covenant Of Good Faith And Fair Dealings)
### (Bancorp)

271.     Debtor re-asserts and re-allege paragraphs 1 through 233 above, as if fully set forth herein.

272.     This is an action seeking monetary damages for breach of the implied covenant of duty of good faith and fair dealings.

273.     Under §1-203 of the Uniform Commercial Code, Bancorp owed a duty to perform or enforce its obligations under the loan agreements in good faith, particularly in light of its fiduciary duties owed to the Debtor.

274.     Bancorp, by and through its agents, breached this duty in the following ways, including, but not limited to: (a) failing to properly apply various funds to the debt service under the Bancorp Loans as required under the loan agreements; (b) prohibiting the Debtor from moving forward with the redevelopment of the Mall as promised prior to, during, and after the various loan documents were executed; (c) charging exorbitant fees for the loans; (d) failing to issue lien releases in order for the Debtor to sell parcels of real property; (e) failing to follow through on the promises to fund after fraudulently inducing the Debtor to sign releases when Bancorp knew that it never intended on following through with its promises; and (f) fraudulently transferring and/or misappropriating money from the Debtor to pay other Bancorp loans or other unauthorized uses.

275.     Upon information and belief, Bancorp deliberately took these actions to destroy the Debtor's commercial viability and, thus, try to sell Debtor's asset to one of Bancorp's related or controlled entities for little or no money.

276.    Bancorp's actions, by and through its authorized agents, impaired the value of the Debtor's assets by denying Debtor access to its operating income and fraudulently transferring the Debtor's income to be used to cover up Bancorp's bad commercial loans.

277.    As a direct and proximate cause of Bancorp's breaches of the implied covenant of good faith and fair dealings, Debtor suffered damages.

**WHEREFORE**, the Debtor respectfully requests that this Court enter a judgment against Bancorp in favor of the Debtor:  (i) finding Bancorp liable for breach of the implied covenant of good faith and fair dealings; (ii) awarding to the Debtor damages for its actual and consequential damages arising from Bancorp's breach of the implied covenant of good faith and fair dealings; (iii) awarding to the Debtor all costs and expenses incurred in this action; (iv) awarding to the Debtor prejudgment and post-judgment interest; and (v) granting other and further relief to Debtor as the Court deems just and proper.

## COUNT VIII
### (Negligent Administration Of Loan Agreements)
### (Bancorp)

278.    Debtor re-asserts and re-allege paragraphs 1 through 233 above, as if fully set forth herein.

279.    This is an action seeking monetary damages for negligent administration of the loan agreements.

280.    Bancorp owed a duty of care to Debtor to administer the loans in a non-negligent manner.

281.    Bancorp, by and through its agents, breached this duty of care in a negligent manner in the following ways, including, but not limited to: (a) failing to properly apply funds of the Debtor to the debt service under the Bancorp Loans as required under the loan agreements;

(b) prohibiting the Debtor from moving forward with the redevelopment of the Mall as promised prior to, during, and after the various loan documents were executed; (c) charging exorbitant fees for the loans; (d) failing to issue lien releases in order for the Debtor to sell parcels of real property; (e) failing to follow through on the promises to fund after fraudulently inducing the Debtor to sign releases when Bancorp knew that it never intended on following through with its promises; and (f) fraudulently transferring and/or misappropriating money from the Debtor to pay other Bancorp loans or other unauthorized uses.

282.    As a direct and proximate cause of Bancorp's breaches of the duty to administer the loan agreements in a non-negligent manner, the Debtor suffered damages.

**WHEREFORE**, The Debtor respectfully requests that this Court enter a judgment against Bancorp in favor of the Debtor:  (i) finding Bancorp liable for breach of the duty to administer the loan agreements in a non-negligent manner; (ii) awarding to Debtor damages for Debtor's actual and consequential damages arising from Bancorp's breach of the duty to administer the loan agreements in a non-negligent manner; (iii) awarding to the Debtor all costs and expenses incurred in this action; (iv) awarding to Debtor prejudgment and post-judgment interest; and (v) granting other and further relief to Debtor as the Court deems just and proper.

## COUNT VIII
### (Unjust Enrichment)
### (Bancorp)

283.    Debtor re-asserts and re-allege paragraphs 1 through 233 above, as if fully set forth herein.

284.    This is an action for Unjust Enrichment.

285.    At all material times since the inception of the Fashion Square Loan Documents Bancorp has controlled the Lock Box account and all revenue generated from the Fashion Square Mall.

286.    Bancorp was required under the Fashion Square Loan documents to properly apply payments to the Fashion Square loan balance and escrow money for real estate taxes, none of which was done.

287.    Bancorp has transferred and misappropriated money from the Debtor for its own financial benefit and has therefore been unjustly enriched.

288.    As a result of the scheme facilitated by Bancorp's deceptive conduct; these funds were wrongly obtained because they should have been applied to the Fashion Square outstanding loan and payment of real estate taxes.

289.    Bancorp had no right to take the Debtor's money for any other purpose, and it engaged in fraudulent and intentional misrepresentation in order to misappropriate the Debtor's money.  Therefore, it would be inequitable for Bancorp to retain the benefits unjustly.

290.    Had Bancorp properly paid down the Debtor's debt service, and properly escrowed taxes, the Debtor would have a credit on its loan balance.

WHEREFORE, the Debtor respectfully prays that this Honorable Court enter an Order that Bancorp is liable to the Debtor in the full amount of the Judgment on the basis of unjust enrichment, for an award of compensatory damages in favor of the Debtor, in an amount to be determined at trial; award attorneys' fees and costs; and for such other and further relief as this Court shall deem appropriate

### COUNT IX
### (Setoff)
### (Bancorp)

291.     Debtor re-asserts and re-allege paragraphs 1 through 233 above, as if fully set forth herein.

292.     This is an action for setoff as funds misappropriated by Bancorp.

293.     The Debtor is in doubt regarding the amounts applied by Bancorp to the loan.

294.     Upon reason and belief, Debtor is entitled to a setoff or credit of payments that should have been applied to the loan and real estate taxes.

**WHEREFORE,** the Plaintiff respectfully prays that this Honorable Court enter an Order as to setoff; award attorneys' fees and costs; and for such other and further relief as this Court shall deem appropriate.

**COUNT X**
**(Accounting)**
**(Bancorp)**

295.     Debtor re-asserts and re-allege paragraphs 1 through 233 above, as if fully set forth herein.

296.     This is an action for an accounting of all principal, interest, charges, fees, and payments, escrow, and credits related to the Fashion Square Loan.

297.     The Debtor is in doubt regarding the validity, priority, and extent of lien claimed by Bancorp as to the Debtor's property and other assets of the estate.

**WHEREFORE,** the Plaintiff respectfully prays that this Honorable Court enter an Order requiring an accounting by Bancorp for any claims and/or liens of the Bancorp against the property of the Debtor/Plaintiff; award attorneys' fees and costs; and for such other and further relief as this Court shall deem appropriate.

**COUNT XI**
**(Fraudulent Transfer Pursuant To 11 U.S.C. § 548(a)(1)(B)) and 550**
**of the Bankruptcy Code)**

**(Bancorp)**

298.     Debtor re-asserts and re-allege paragraphs 1 through 233 above, as if fully set forth herein.

299.     As set-forth above, Bancorp fraudulently transferred the Debtor's money out of the Lock Box, ("Transfers") that should have been applied to the Debtor's loan and real estate taxes.

300.     The Transfers that Bancorp made originated from the Debtor and constituted transfers of interests in property of the Debtor.

301.     The Debtor received less than reasonably equivalent value in exchange for the Transfers.

302.     The Transfers were made at a time when the Debtor was:

(a)     Insolvent, or became insolvent as a result;

(b)     Engaged in business or a transaction, or was about to engage in business or a transaction, for which the Debtor's property constituted unreasonably small capital;

(c)     Intending to incur, or believed that the Debtor was intending to incur, debts beyond the Debtor's ability to pay as they matured.

WHEREFORE, the Debtor requests the Court to enter judgment:

1)     Declaring the Transfers to have been a fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B);

2)     Avoiding the Transfers made to Bancorp as a fraudulent transfer in violation of 11 U.S.C. § 548(a)(1)(B);

3)     Requiring payment of such Transfers to the Debtor;

4)     Disallowing any claim that Bancorp may have against the Debtor's bankruptcy Estate until such time as the amount of the Transfers has been remitted as provided in 11 U.S.C. § 502(d);

5)     Preserving such Transfers for the benefit of the Estate, pursuant to 11 U.S.C. § 551; and

6)     Granting Debtor's costs and expenses, including reasonable attorneys' fees; and granting such other and further relief as the Court deems just and proper.

## COUNT XII
### (Fraudulent Transfer Pursuant To
### Florida Statute §726.105(1)(b)
### (Bancorp)

303.    Debtor re-asserts and re-allege paragraphs 1 through 233 above, as if fully set forth herein.

304.    As set-forth above, Bancorp fraudulently transferred the Debtor's money out of the Lock Box, ("Transfers") that should have been applied to the Debtor's loan and real estate taxes.

305.    The Transfers that Bancorp made originated from the Debtor and constituted transfers of interests in property of the Debtor.

306.    The Debtor received less than reasonably equivalent value in exchange for the Transfers.

307.    The Transfers were made at a time when the Debtor was:

(a)    Insolvent, or became insolvent as a result;

(b)    Engaged in business or a transaction, or was about to engage in business or a transaction, for which the Debtor's property constituted unreasonably small capital;

(c)    Intending to incur, or believed that the Debtor was intending to incur, debts beyond the Debtor's ability to pay as they matured.

WHEREFORE, the Debtor requests the Court to enter judgment:

1)     Declaring the Transfers to have been a fraudulent transfer pursuant to Florida Statute §726.105(1)(b);

2)      Avoiding the Transfers made to Bancorp as a fraudulent transfer in violation of Florida Statute §726.105(1)(b);

3)      Requiring payment of such Transfers to the Debtor;

4)      Disallowing any claim that Bancorp may have against the Debtor's bankruptcy Estate until such time as the amount of the Transfers has been remitted as provided in Florida Statute §726.105(1)(b);

5)      Granting Debtor's costs and expenses, including reasonable attorneys' fees; and granting such other and further relief as the Court deems just and proper.

## COUNT XIII
### (Civil Conspiracy)
### (Betsy Cohen, Daniel Cohen)

308.    Debtor re-asserts and re-allege paragraphs 1 through 233 above, as if fully set forth herein.

309.    Defendants agreed and/or conspired to do unlawful acts or to do lawful acts by unlawful means against the Debtor.

310.    Betsy Cohen and Daniel Cohen, directed and instructed their management and employees of Bancorp to make false and fraudulent promises and representations in order

311.    Betsy Cohen and Daniel Cohen acted in concert, conspired, and agreed with each other to induce the Debtor to enter into the Fashion Square Loan Agreements, Key West Loan Agreements and the Bancorp Purchase, all while knowing that Bancorp intended on fraudulently transferring and misappropriating the Debtor's funds for Bancorp and the Cohen's benefit.

312.    Betsy Cohen and Daniel Cohen acted in concert, conspired, and agreed with each other to induce the Debtor to enter into the Fashion Square Loan Agreements, Key West Loan Agreements and the Bancorp Purchase in order to utilize the Debtor's revenues to cover up Bancorp's bad commercial loans.

313.    Betsy Cohen and Daniel Cohen acted in concert, conspired, and agreed with each other to fraudulently induce the Debtor to enter into the Fashion Square Loan Agreements, Key West Loan Agreements and the Bancorp Purchase making the Debtor believe that Bancorp supported the re-development plan.

314.    Betsy Cohen and Daniel Cohen acted in concert, conspired, and agreed with each other to fraudulently induce the Debtor to enter into the Fashion Square Loan Agreements, Key West Loan Agreements and the Bancorp Purchase so that the Defendants could drive down the value of the Fashion Square Mall after the Debtor and Mr. Fish spent millions of dollars to account for Bancorp's bad acts, so that Betsy Cohen and Daniel Cohen could transfer the Fashion Square Mall to one of its related real estate investment trusts for little or no money.

315.    Betsy Cohen and Daniel Cohen conspired to take, by unlawful means, money from the Debtor and to cover up such actions through false statements, misrepresentations and lies.

316.    In pursuance of the conspiracy, Betsy Cohen and Daniel Cohen unlawfully accepted money they knew or should have known was based on misrepresentations, and/or took steps to conceal the theft, receipt and expenditure of such funds.

317.    As a result, the Debtor has been damaged.

## DEMAND FOR JURY TRIAL

The Plaintiff demands trial by jury on all issues so triable as a matter of law.


Dated this 27th day of January, 2017.

**BROAD AND CASSEL**


 */s/ Nicolette C. Vilmos*
Nicolette Corso Vilmos, P.L.

Florida Bar No.: 0469051
390 North Orange Avenue,
Suite 1400
Orlando, FL 32801
Telephone: 407-839-4233
Facsimile:  407-650-0955
nvilmos@broadandcassel.com